IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICE R., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 19 C 1285 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cummings |
| ANDREW SAUL, ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Patrice R. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied her application for a period of disability and Disability Insurance Benefits ("DIBs") under the Social Security Act. 42 U.S.C. §§416(i), 402(e), and 423. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment [Dckt. #13] is granted.

**I.      BACKGROUND**

**A.      Procedural History**

On December 6, 2014, Claimant filed a disability application alleging a disability onset date of February 10, 2014. Her claim was denied initially and upon reconsideration. On January 30, 2018, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on December 20, 2018, making the ALJ's

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Patrice R. as Claimant.

1

decision the Commissioner's final decision. 20 C.F.R. §404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court on February 21, 2019.

### B. Medical Evidence

#### 1. Evidence From Claimant's Treatment History

Claimant suffers from a wide range of physical and non-physical disorders. In fact, an August 2015 treatment note shows that primary care physician Dr. Lauren Katz-Pham addressed 20 different issues with Claimant on that date: obesity, anxiety, mixed anxiety with depressive disorder, obstructive sleep apnea, hypertension, hemorrhoids, pharyngitis, asthma, rhinitis, melana, gastroenteritis, pruritis, uticaria, joint pain, shoulder pain, spinal stenosis in the cervical spine, fibromyositis, fatigue, and fever. (R. 1191). A February 2016 note identifies 31 distinct disorders. (R. 2009). As discussed below, moreover, Claimant was also diagnosed with knee arthritis, chronic pain syndrome, myofascial pain syndrome, neuropathy, migraine headaches, degenerative changes in her lumbar spine, obsessive compulsive disorder, and bipolar disorder.

For the purpose of this matter, the most pressing of these disorders are obesity and fibromyalgia. The record shows only sporadic notations that Claimant was obese such as Dr. Katz-Pham's August 2015 entry, but none of them are more than passing references to obesity. However, a larger number of entries address fibromyalgia. Claimant was diagnosed with that disorder in August 2012 by rheumatologist Dr. Prerna Panchal, who noted that she was "doing not very well." (R. 609). Claimant was given a wide range of pain medications that did not provide any significant relief. On July 30, 2015, Dr. Panchal expanded her diagnosis by stating that Claimant also suffered from myofascial pain syndrome. She noted that Claimant was "hypersensitive" to pain all over her body and was "crying due to pain in all tender points." (R.

1273). By October 2015, Dr. Panchal had added a further diagnosis of chronic pain syndrome to fibromyalgia. She noted that Claimant "has tried almost all medications" but continued to have "severe generalized pain." (R. 1438). Dr. Panchal reiterated those diagnoses in April 2016, when she noted that Claimant was only taking Naprosyn for pain. (R. 1505).

Claimant also suffers from degenerative disc pain in her lower back and neck. She was diagnosed with cervical radiculopathy in May 2015 with moderate degenerative changes in the cervical spine. (R. 1279-80). Claimant experienced radicular pain stemming from constrictions at L5-S1 as well as osteoarthritis in both knees. In January 2015, she began having right-shoulder pain that affected her ability to carry, lift, and reach overhead. Claimant underwent physical therapy, was diagnosed with adhesive capsulitis ("frozen shoulder") in November 2015, and eventually underwent shoulder surgery for a rotator cuff repair on October 12, 2016. (R. 1713, 1730). She also experienced migraine headaches. A May 2015 MRI revealed small non-specific white lesions on her brain, and Claimant began treatment with neurologist Dr. Sailaja Maramreddy. Claimant told Dr. Maramreddy that she was having headaches three times a week. Dr. Maramreddy directed Claimant to take Topamax for her migraines, which led to an improvement in her symptoms. In November 2016, however, Dr. Maramreddy also diagnosed progressive idiopathic neuropathy in both hands. (R. 1893).

Finally, Claimant underwent treatment for depression and anxiety starting in 2015. Therapist Michelle Hyman noted in October 2016 that Claimant was paranoid with only limited insight.[2] (R. 1529). Dr. Katz-Pham's notes show that Claimant was treated with antidepressant medications such as amitriptyline and Cymbalta, but the record strongly suggests that these drugs

---

[2] The record is not entirely clear about Claimant's mental health treatment. The issue is not helped by Claimant, who mistakenly asserts that Ms. Hyman, a social worker, was her treating psychiatrist. (Dckt. #14 at 5).

3

were primarily prescribed to treat Claimant's fibromyalgia pain instead of her depression and anxiety. As the ALJ noted, Claimant was diagnosed at various points with depression, anxiety, obsessive compulsive disorder, and bipolar disorder. (R. 115).

### 2.     Evidence From the State-Agency Experts

On June 1, 2015, non-examining expert Dr. David Voss found that depression and anxiety constituted non-severe mental disorders. (R. 67). Dr. Michael Schneider confirmed those findings on reconsideration on October 29, 2015. (R. 90).

On June 2, 2015, Dr. David Mack determined that Claimant's cardiac issues and degenerative disc disease constituted severe impairments. Fibromyalgia was found to be non-severe, and obesity was not assessed. (R. 88). Claimant could lift up to 20 pounds occasionally and 10 pounds frequently. She could sit and stand or walk up to six hours a day and had an unlimited ability to push or pull. Claimant could never climb ladders and could only occasionally crouch, stoop, or crawl. However, Dr. Mack found no restrictions in Claimant's ability to kneel or balance. At the reconsideration level on October 30, 2015, Dr. James Madison restricted Claimant to lifting or carrying only 10 pounds both occasionally and frequently. She could still sit up to six hours a day but could stand or walk for two hours. Dr. Madison also differed from Dr. Mack's findings concerning exposure to noise and vibration. Dr. Mack did not believe that Claimant required any protection from these environmental hazards; Dr. Madison stated that she must avoid concentrated exposure to both. (R. 93).

On April 11, 2015, psychiatrist Dr. Chirag Raval examined Claimant at the SSA's request. Claimant told Dr. Raval that she had difficulty working due to shooting pains in her body, insomnia, and fatigue. Dr. Raval noted that her grooming was appropriate and that she was polite, well-groomed, and talkative. Claimant appeared to be minimally depressed and

4

described her mood as "disappointed." She had appropriate abstract thinking and judgment. Dr. Raval diagnosed Claimant with major depression and a generalized anxiety disorder and found that she would be able to manage any funds awarded to her. (R. 1156-59).

Dr. Jyothi Gondi examined Claimant's physical condition on the same day. Claimant had a full range of motion in her hips, knees, and ankles, though she was tender in both hips while extending them. Claimant showed limited flexion in her cervical spine and in the lumbar spine. Dr. Gondi found clinical impressions of fibromyalgia, status post-cervical fusion, mitral regurgitation, depression and anxiety, hypertension, a history of asthma, and sleep apnea. (R. 1183-85).

### 3. Evidence From the Treating Experts

On May 8, 2016, Dr. Maramreddy issued a musculoskeletal defects report for Claimant. She stated that Claimant's current diagnosis was fibromyalgia but that she had only treated Claimant for cervical radiculopathy. Dr. Maramreddy advised that Claimant suffered from radiculopathy, numbness and tingling, and frequent headaches. She experienced moderate pain in her neck that affected her upper extremities. Claimant's symptoms frequently impacted her concentration and prevented her from working on a full-time basis. In addition, Dr. Maramreddy found that Claimant would need to be absent from work more than three times each month. (R. 1440-42).

### 4. Evidence From Claimant's Testimony

Claimant appeared at a hearing on July 12, 2017 and described her symptoms to the ALJ. She identified her primary problem as pain. (R. 21, "I'm in pain, I'm in pain all the time."). She is allergic to narcotic medications and tried a variety of non-narcotic prescriptions without success. (R. 21-23). In addition to affecting her ability to move, pain also limits her sleep to

only three hours each night and leaves Claimant tired throughout the day. (R. 25). In addition to the pain from fibromyalgia, Claimant also experiences migraine headaches that come in clusters once every two months. (R. 27). She also suffers from numbness and tingling caused by neuropathy that comes and goes. (R. 24).

Claimant told the ALJ that her symptoms significantly constrain her daily activities. She can only walk for 20 minutes at a time and must then sit down. Her ability to sit is limited to 30 to 45 minutes. (R. 36-37). She can shop for "small stuff" but her husband must help her with larger items. Claimant cannot vacuum, though she can do less strenuous household tasks as long as she is able to take a break. (R. 33). Although she formerly enjoyed swimming, Claimant is no longer able to do laps in the pool but manages to do "cardio," "noodles," and use an exercise bike.

### C.     The ALJ's Decision

On January 30, 2018, the ALJ issued a written decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decision, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since her alleged onset date of February 10, 2014. Her severe impairments at Step 2 included obesity; fibromyalgia; degenerative disc disease of the cervical spine, lumbar spine, and right shoulder; idiopathic neuropathy; migraine headaches; osteoarthritis of the bilateral knees; depression; and anxiety. The ALJ also assessed numerous non-severe impairments. These included cardiac complaints of hypertension and mitral prolapse; abdominal and digestive complaints such as pain, constipation, hemorrhoidal bleeding, and nausea; obstructive sleep apnea; and asthma.

None of these impairments met or medically equaled a listing at Step 3 either singly or in combination. As part of the Step 3 analysis, the ALJ considered the severity of Claimant's

6

mental disorders by applying the "special technique" provided under 20 C.F.R. §404.1520a. She found that Claimant had moderate restrictions in adapting or managing herself and in her ability to concentrate, persist, or maintain pace. Mild restrictions were found in interacting with others and in understanding, remembering, or applying information.

Before moving to Step 4, the ALJ determined that Claimant's descriptions of the severity and frequency of her symptoms were not fully supported by the record. The ALJ also assigned weights to the reports of various medical experts. She gave little weight to Dr. Maramreddy's opinion on the work that Claimant could perform. The ALJ also gave little weight to the state-agency psychologists Dr. Voss and Dr. Schneider, both of whom had concluded that depression and anxiety were not severe impairments. The ALJ gave partial weight to the state-agency expert Dr. Mack – who had found that Claimant could perform light work – but also gave partial weight to Dr. Madison's assessment of sedentary work. Having rejected all of the expert opinions on Claimant's exertional and non-exertional abilities, the ALJ assessed an RFC of sedentary work with a range of limitations that included a finding that "[s]he can learn, understand, remember and carry out simple, routine work tasks and can sustain such tasks in two-hour increments throughout the typical workday." (R. 110).

Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ found at Step 4 the Claimant could not carry out her past relevant work as an accounting clerk supervisor or office manager. The ALJ testified, however, that jobs were available in the national economy that a person with Claimant's RFC could perform. The ALJ accepted that testimony and found at Step 5 that Claimant was not disabled.

7

## II.  LEGAL ANALYSIS

### A.  The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*.

8

If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### III. DISCUSSION

Claimant argues that the ALJ erred at Step 5 and improperly evaluated her symptom testimony. Her main argument, however, is that the ALJ failed to properly construct the RFC. The Court agrees that the ALJ's decision requires remand, but it addresses the issue on grounds that go beyond the claims that Claimant asserts.

#### A. The ALJ Must Restate Her Reasons for the RFC

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of activities of daily living ("ADL"); medical source statements; and the effects of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

The RFC must accommodate all of a claimant's limitations that are supported by the medical evidence and other relevant nonmedical evidence. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. §404.1545. This includes limitations arising out of severe and non-severe impairments. *Id.* "Even if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling." *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) (citing cases). In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts

10

(e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. That includes an explanation of why the claimant is able "to perform sustained work activities in an ordinary work setting on a regular and continuing basis" eight hours a day for five days a week. *Id*.

### 1. Obesity

As Claimant noted, the ALJ identified obesity as one of her "severe impairments." (R.104). However, the Court finds as explained below that the ALJ failed to properly account for Claimant's obesity within her analysis.

Obesity is not a listed impairment, and on September 12, 2002, the SSA issued SSR 02-1p as guidance on how adjudicators should evaluate that condition.[3] Obesity can meet a listing "if there is an impairment that, in combination with obesity, meets the requirements of a listing." SSR 02-1p, 2002 WL 34686281, at *5 (Sept. 12, 2002). Obesity can also medically equal a listing on its own, and SSR 02-1p provides examples of how such a finding can be reached. *Id*. If obesity does not meet or equal a listing, the ALJ must still consider its effect on the claimant's RFC. SSR 02-1p states that obesity can limit a wide range of functions that "may not be obvious." *Id*. at *6. Accordingly, "[a]n assessment should . . . be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." *Id*. A central principle of such an analysis is that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." *Id.* An ALJ must therefore carefully consider the combined effect that obesity has on

---

[3] SSR 02-1p was replaced by SSR 19-2p on May 20, 2019. The new SSR only applies to applications filed after May 20, 2019, however, and does not have retroactive effect. *See Holt v. Saul*, No. 4:19-CV-01894, 2020 WL 2549346, at *3 (S.D.Tex. May 19, 2020).

11

the claimant's other impairments, including those that are found at Step 2 to be non-severe. *See Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018); *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The ALJ did not comply with these requirements in her decision. She did not mention obesity at Step 3, and it is unclear if she considered its effect on Claimant's other impairments at that stage. Her only reference to obesity after Step 3 in relation to specific disorders was to state that it "likely contributes to [the] fatigue and ambulatory deficits" that stemmed from Claimant's fibromyalgia. (R. 112). Such tentative terms do not adequately account for the issue because an "ALJ must specifically address the effect of obesity on a claimant's limitations." *Villano*, 556 F.3d at 562. Instead of specificity, the ALJ relied on the language of probability, left it unclear if she actually thought that obesity worsened Claimant's fibromyalgia symptoms, and made no attempt to assess what they were. *See Toft v. Colvin*, No. 08 C 2861, 2013 WL 2285786, at *6 (N.D.Ill. May 23, 2013) ("But to recognize that this *may be* the case [concerning obesity] is not the same as engaging in a reviewable analysis[.]") (emphasis in original). If the ALJ was uncertain if obesity affected Claimant's fibromyalgia, she could have called a medical expert to clarify the issue for her.

Moreover, the ALJ gave no consideration to obesity's possible effects on Claimant's other severe and non-severe impairments. SSR 02-1p is very clear that an ALJ must always account for obesity's impact on the limitations created by a claimant's disorders. Claimant, for example, suffers from degenerative disc disease in her spine, and obesity can complicate "limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling." SSR 02-1p, 2002 WL 34686281, at *6; *see also Barbara T. v. Saul*, No. 2:19CV345, 2020 WL 3888179, at *9 (N.D.Ind. July 10, 2020) ("Back impairments, with

12

obesity, can make standing and/or walking more difficult."). Claimant also has arthritis, and "a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Villano*, 556 F.3d at 562. SSR 02-1p further explains that the combination of sleep apnea – which Claimant suffers from – and obesity "can lead to drowsiness and lack of mental clarity during the day." 2002 WL 34686281 at *6 ("This may be particularly true in cases involving sleep apnea."). The Court notes that Claimant complained of such fatigue throughout the record. The ALJ further found that Claimant's mental impairments were severe, and "[o]besity may also cause or contribute to mental impairments such as depression." *Id*. at *3. Despite these clear guidelines, the ALJ never referred to SSR 02-1p in her decision or considered obesity's relation to any of Claimant's impairments other than fibromyalgia.

The ALJ also failed to give adequate consideration to the combined effect that was caused by obesity and all of Claimant's impairments. Near the end of her decision, the ALJ said that she had limited Claimant to more restrictions than Dr. Madison had assessed "in light of the claimant's spinal/lower extremity complaints, fatigue, and obesity." (R. 115). Even if that can be construed to have considered the combined effects of these disorders/symptoms, the ALJ gave no consideration to the others. She assessed 10 severe impairments – obesity, fibromyalgia, degenerative disc disease of the lumbar spine, disc disease of the cervical spine, neuropathy, migraines, right-shoulder joint disease, knee arthritis, depression, and anxiety – and four non-severe disorders of cardiac problems, abdominal pain, sleep apnea, and asthma. Claimant stated that she experienced serious pain from several of these conditions – fibromyalgia in particular – but the ALJ did not address that issue. Courts have explained that "the *combined* effects of the applicant's impairments must be considered, including impairments that considered one by one are not disabling." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (emphasis in original);

13

*see also Alesia v. Astrue*, 789 F.Supp.2d 921, 932 (N.D.Ill. 2011). That includes consideration of *all* of a claimant's impairments, including those that are not severe. *See Young v. Barnhart*, 362 F.3d 995, 998 (7th Cir. 2004) ("Even a non-severe impairment can put a disproportionately greater strain on a person who concurrently is suffering from a more severe affliction.").

That said, a failure to address obesity can be harmless error when an ALJ adopts the restrictions assessed by an expert who was aware that obesity was a medical issue for the claimant. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 514 (7th Cir. 2004). That does not apply here because the state-agency physicians Dr. Mack and Dr. Madison both failed to find that obesity was an impairment for Claimant. Indeed, the physicians did not mention obesity in the notes that accompany their reports, and nothing suggests that they were even aware that Claimant was obese. The ALJ correctly determined on her own that obesity was a severe impairment; having done so however, she was obligated to consider it at all stages of her decision. Her failure to do so, combined with the further problems addressed below, persuade the Court that remand is necessary so that the ALJ can explain the basis of her reasoning with greater care.

### 2. Pain and Fibromyalgia

The ALJ also failed to explain how she accounted for Claimant's statements about her pain and, in particular, how she evaluated fibromyalgia. Pain was Claimant's primary reason for claiming that she could not work full time. The ALJ acknowledged some of Claimant's pain statements about fibromyalgia as part of her review of the record. (R. 112, noting "severe, generalized pain"). She also cited some of the pain that Claimant experienced as a result of other impairments. Her reasoning, however, raises serious concerns about the degree to which the ALJ understood how pain should be evaluated in disability cases. She stated that "the objective

14

medical evidence of record suggests that *despite her complaints* and functional limitations, [Claimant] retains the ability to perform a range of work at the sedentary exertional level." (R. 112) (emphasis added). That is, the ALJ thought that pain did not require an independent analysis because the objective record trumped Claimant's complaints about pain. The ALJ then concluded her RFC discussion by again explaining that her assessment was supported by the "objective medical evidence" and "the lack of corroborating objective evidence." (R. 117). In both instances, the ALJ gave no indication that she considered Claimant's pain allegations except insofar as they accorded with objective tests and evidence.

This line of reasoning ignores the Seventh Circuit's repeated instruction that pain can be disabling "even when its existence is unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); *see also Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("Pain can be severe to the point of being disabling even though no physical cause can be identified[.]"); *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010) ("It would be a mistake to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain.'"). A correct evaluation of pain was particularly important in this case because in addition to degenerative disc disease Claimant also suffers from fibromyalgia. The ALJ should have recognized that "[t]he extent of fibromyalgia pain cannot be measured with objective tests aside from trigger-point assessment." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018). As with pain in general, the ALJ never addressed this well-established principle about fibromyalgia, did not cite SSR 12-2p (which addresses that disorder), and showed no awareness that Claimant's fibromyalgia pain could have been greater than the objective record showed.[4]

---

[4] It is not entirely clear what the ALJ's RFC discussion of fibromyalgia was designed to accomplish. She reviewed a number of record entries only to conclude: "Though there is no evidence that other conditions

15

The ALJ concluded her RFC discussion of fibromyalgia by stating that Claimant had "been accommodated with the physical and postural limitations adopted herein." (R. 112). She did not explain what restrictions were related to fibromyalgia, but her language plainly implies that Claimant only required exertional – not *nonexertional* – limitations. SSR 12-2p, however, instructs ALJs that a person with fibromyalgia "may also have nonexertional physical or mental limitations because of their pain or other symptoms." 2012 WL 3104869, at *6. The record strongly suggests that Claimant experienced multiple symptoms that could have required nonexertional accommodations. Fatigue, for example, is one of the "principal symptoms" of fibromyalgia. *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008). The ALJ noted that Claimant alleged fibromyalgia-related fatigue, and Claimant testified that she needed to nap daily due to fatigue. (R. 32). Claimant also told the ALJ that fibromyalgia made her "depression kick in," (R. 48), and SSR 12-2p advises that depression and anxiety can be manifestations of fibromyalgia. 2012 WL 3104869, at *2. The ALJ must explain why these fibromyalgia symptoms did not require some form of nonexertional restriction, and she should do so by considering SSR 12-2p and the guidelines that apply for assessing fibromyalgia pain.

### B. The ALJ Should Restate Her Reasons for the Symptom Evaluation

The ALJ should also restate her reasons for the symptom evaluation. As it stands, the Court is unable to determine how the ALJ considered the role that Claimant's daily activities

---

have been ruled out as the possible cause of the claimant's symptoms, the undersigned gives the claimant the benefit of the doubt and finds that she has fibromyalgia." (R. 112). Discussing whether fibromyalgia existed, however, was superfluous because the ALJ had *already* decided at Step 2 that it constituted a severe impairment. It is also unclear why the ALJ thought that she needed to give Claimant "the benefit of the doubt" when Dr. Panchal – a rheumatologist with expertise in fibromyalgia – diagnosed the disorder as early as 2012. The ALJ clearly thought that it was important to rule out other causes for Claimant's symptoms, but that indicates a misunderstanding of how fibromyalgia is evaluated. "Fibromyalgia is not a diagnosis of exclusion and must be diagnosed by its own characteristic features." https://fibroandpain.org/fibromaglia/diagnosis (last visited Sept. 13, 2020).

16

played in this issue. The ALJ began her discussion by identifying Claimant's testimony about her ADLs and stated that they were "inconsistent with an individual experiencing totally debilitating symptomology." (R. 111). "The test under the Act, however, is not whether a plaintiff has 'total disability,' but whether he can perform in a competitive work environment on a full-time basis." *Shelton v. Colvin*, No. 3:14-CV-01561-SI, 2015 WL 7721205, at *10 (D.Or. Nov. 30, 2015). Some of Claimant's testimony clearly indicated that she could *not* perform such competitive work. She stated, for instance, that she could only walk for 20 minutes and sit for 30 to 45 minutes at a time. A person who cannot sit or walk more than this could not carry out the RFC that the ALJ fashioned for Claimant.

The ALJ's task was to evaluate what Claimant stated about her ADLs. Instead of doing so, the ALJ listed a series of activities without drawing any link between those activities and the RFC. Some of what she cited was irrelevant to Claimant's work ability. The ALJ thought it was notable, for example, that Claimant could feed her pets, clean their litter box, and make her own bed. These minimal tasks have no logical relationship to the ability to work eight hours a day at any exertional level. They show that Claimant was not completely immobile, but a person does not have to be "bedridden or completely helpless to be found disabled." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). The ALJ also cited a series of ADLs without accounting for all that Claimant stated. The ALJ noted that Claimant swam, went grocery shopping, and did laundry. Claimant testified, however, that she only shopped for "small stuff" and that her husband does the "big grocery shopping." (R. 30). She can no longer swim laps in the pool and only does "cardio" and "noodles" – activities whose exertional level the ALJ did not ask Claimant to describe. (R. 40). Moreover, moving in a pool is not the equivalent to sustained

17

movement during a workday. Claimant also does laundry only with help and requires rest periods when doing other household chores. (R. 34, 244).

An ALJ cannot merely compile a list of a claimant's daily activities – and certainly cannot present an inaccurate version of them – as if their relevance to the symptom evaluation were self-evident. "Instead, the ALJ must provide an explanation as to *how* the daily activities are inconsistent with a claimant's subjective symptoms." *Clark v. Saul*, 421 F.Supp.3d 628, 632 (N.D.Ind. 2019) (emphasis in original). The ALJ did not attempt to do so here, and her oversight is particularly troubling in light of her failure to properly assess Claimant's pain or to consider the combined effects of her numerous impairments. The Seventh Circuit has repeatedly explained "that a person's ability to perform daily activities . . . does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (citing cases). The ALJ must therefore explain more carefully how she evaluated Claimant's ADLs and draw some link between them, the symptom evaluation, and the RFC.

## CONCLUSION

For these reasons, Claimant's motion for summary judgment [Dckt. #13] is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) reassess Claimant's symptom testimony, (2) account for her obesity according to SSR 02-1p, (3) re-evaluate Claimant's pain and fibromyalgia by applying SSR 12-2p and the standards stated herein, and (4) restate the reasons for the RFC.

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: February 5, 2021**